Case 11-01896-KCF    Doc 18    Filed 10/12/12    Entered 10/12/12 12:06:52    Desc Main
                           Document      Page 1 of 18

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 09-21745 |
| Designline Construction Services, Inc. | : | Chapter 7 |
| Debtor | : | |
| Thomas J. Orr | : | |
| Plaintiff, | : | |
| vs. | : | Adversary No. 11-1896 |
| Gregory Sarangoulis and GMI First, Inc. | : | |
| | : | **MEMORANDUM OPINION** |
| Defendant(s) | : | |

**APPEARANCES**

Attorneys for Plaintiff
Andrea Dobin, Esquire
Graig Corveleyn, Esquire
Sterns & Weinroth
50 West State Street – Suite 1400
Trenton, New Jersey 08607

Attorney for Defendant
Andrew Kelly, Esquire
The Kelly Firm
1011 Highway 71 – Suite 200
Spring Lake, New Jersey 07762

On September 10, 2012, the court took oral argument on the Trustee's motion for summary judgment, and the Defendants' cross-motion for summary judgment.[1] After considering the papers and oral argument, the court reserved decision. The following are the court's finding of facts and conclusions of law in accordance with 28 U.S.C. § 157(c).

As a preliminary matter, the court will address the Defendants's request for dismissal.[2] The Defendants seek dismissal of the Complaint under Federal Rule of Civil Procedure 19 for failure to join John Hildreth and EFS Structures, Inc. ("EFS") as indispensible parties. The Defendants argue that the Trustee's failure to include them is fundamentally unfair because they are being asked to pay twice. That argument is misguided in several respects. First, Rule 19, made applicable here through Fed. R. Bankr. P. 7019, provides that dismissal **may** be appropriate if it would "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." There is no risk of that here. Mr. Hildreth and EFS have no basis for bringing an action against the Defendants based on the EFS transaction. The opposite is true, as evidenced by the fact that Mr. Sarangoulis has already obtained a $200,000 judgment (payable solely for his benefit) against Mr. Hildreth as a result of the EFS transaction. Second, Mr. Sarangoulis made clear at his deposition that he retained all of the funds transferred from the Debtor as his "fee" for allowing Mr. Slabon the opportunity to invest in the EFS technology. None of the Debtor's funds were transferred to Mr. Hildreth or EFS, so there is no basis for the Trustee to include those parties in this action. The request to dismiss the complaint based on Rule 19 is denied.

**Summary judgment standard**

---

[1] At oral argument, Defendants' counsel stated that based on the Trustee's opposition to the cross-motion he now believed there are disputed issues that would preclude granting summary judgment.

[2] The Defendants plead failure to join an indispensable party in their Answer and Affirmative Defenses and raised it again in their cross-motion.

2

Federal Rule of Civil Procedure 56, governing summary judgment motions, was substantially revised in December 2010. The comment to Rule 56 provides that the changes were intended "to improve the procedures for presenting and deciding summary-judgment motions …." Among other changes, the familiar formulation of "genuine *issue* of material fact" that was previously set forth in 56(c) was moved to 56(a) and modified to read "genuine *dispute* as to any material fact." Rule 56(a) now provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." The comments to the Rule indicate that the 2010 "amendments will not affect continuing developments of the decisional law construing and applying these phrases."[3]

Accordingly, it remains a correct statement of the law to say that when faced with a summary judgment motion, the court must view the facts "in the light most favorable to the nonmoving party."[4] After the movant shows that there is no genuine issue for trial, the non-moving party then bears the burden of identifying evidence that creates a genuine dispute regarding material facts.[5] To be material, a fact must have the potential to alter the outcome of the case.[6] Disputes over non-essential facts will not preclude a grant of summary judgment.[7]

**Constructive fraudulent transfer [11 U.S.C. § 548(a)(1)(B)]**

The Trustee filed a two count complaint seeking to recover fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) (Count One) and § 548(a)(1)(A) (Count Two). The Trustee readily

---

[3] *See also*, Various Plaintiffs v. Various Defendants, -- F. Supp. 2d --, 2012 WL 1106730 (E.D. Pa. April 3, 2012)
[4] Scott v. Harris, 550 U.S. 372, 380 (2007)
[5] Celotex Corp. v. Catrett, 477 U.S. 317 (1986)
[6] Kaucher v. County of Bucks, 455 F.3d 418 (3d Cir. 2006)
[7] NAACP v. North Hudson Regional Fire & Rescue, 665 F.3d 464 (3d Cir. 2011)

3

acknowledges that it is his burden to prove the elements of a fraudulent transfer by a preponderance of the evidence.[8] To prevail on Count One, the Trustee must establish: (1) the debtor had an interest in the property; (2) the transfer of the interest occurred within two years of the petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the debtor "received less than a reasonably equivalent value in exchange for such transfer."[9]

The first element requires the Trustee to establish that the Debtor transferred an interest in property. "Transfer" is broadly defined in the Bankruptcy Code to encompass "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) and interest in property."[10] The Trustee seeks to recover five transfers totaling $571,000. The Trustee asserts that the Debtor made those transfers to Mr. Sarangoulis and/or his company GMI First by checks drawn on the Debtor's operating account.[11] The Defendants admit that the checks were written, but dispute that they all related to the ESF Transaction.[12] That admission is sufficient for a finding that a transfer of the Debtor's property occurred. Therefore, the court finds that the trustee has established the first element.

The next issue is whether the transfers were within 2 years of the date of filing. The transfers at issue occurred between 6/12/2008 and 10/13/2008. The petition was filed on 5/7/2009, thus all of the transfers were within the two-year period prior to the petition date. Therefore, the court finds that the Trustee has also established the second element.

---

[8] Dobin v. Hill, 342 B.R. 183, 197 (Bankr. D.N.J. 2006) (appropriate standard is preponderance of the evidence)
[9] 11 U.S.C. § 548(a)(1)(B)
[10] 11 U.S.C. § 101(54)(D)
[11] See, Ex. G to Orr Cert. (Debtor's general ledger)
[12] See, para. 18 of Defendants' Response to Statement of Undisputed Facts; para. 21 of the Defendants' Answer.

The third element concerns a debtor's financial condition at the time of the transfer. In support of the third element, the Trustee has submitted an expert report from Allen D. Wilen, CPA/CFF, CFA, CIRA from the firm of EisnerAmper.[13] The Wilen Report concludes that as of December 31, 2007 through the petition date, the Debtor was insolvent based on a balance sheet approach. The Wilen Report also concludes, based on the Debtor's quick ratio, that the Debtor was not capable of paying its debts as they became due during the relevant period. Section 548 sets forth four alternative ways to establish this element: one is a showing that the debtor was insolvent,[14] and another is showing that a debtor was incurring debts beyond its ability to pay.[15] The Wilen Report supports a finding of financial instability under either alternative.

Defendants's argue that there are significant factual issues raised by the Wilen Report that "make reliance on that report for summary judgment purposes inappropriate and mandate cross-examination of Wilen." In actuality, Defendants's brief does not highlight any facts that are in dispute; rather, the brief criticizes the accounting methods and assumptions underlying the Wilen Report. That is not a proper defense to a summary judgment motion. It is well established that a party cannot defeat a motion for summary judgment "by merely making allegations; instead, the opposing party must go beyond its pleading and designate specific facts … showing there is a genuine issue for trial."[16] Rule 56 provides that a "party asserting a fact cannot be or is genuinely disputed must support the assertion by: (a) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

---

[13] Orr Cert. Ex. F
[14] 11 U.S.C. § 548(a)(1)(B)(ii)(I)
[15] 11 U.S.C. § 548(a)(1)B)(ii)((III)
[16] In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002) (internal citations omitted)

5

admissions, interrogatory answers, or other materials".[17]  The Defendants did not retain their own insolvency expert or submit the affidavit of a qualified professional to challenge the accounting methods and assumptions in the Wilen Report.  As noted in the leading bankruptcy treatise, the "calculation of insolvency is often technical and will require expert testimony as to the value of the assets and the expose of the liabilities."[18]  At oral argument, Defendants' counsel argued that the court does not need to accept the Wilen Report at face value, and that even without their own expert the Defendants' are entitled to cross-examine Mr. Wilen about his report.  That would certainly be true but for the fact that the Trustee filed this summary judgment motion.  Once the issue of solvency is put before the court by way of a summary judgment motion, the Defendants cannot simply rely on their opinion that the Wilen Report is wrong; that does not create a triable factual dispute. While a trial court "must view the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party,"[19] the court need not "give credence to 'mere allegations,' or draw inferences … not supported by 'specific facts.'"[20]

The Defendants's attack on the Wilen Report also uses the wrong evidentiary standard.  Defendants assert that "[a]bsent indisputable evidence that Debtor was insolvent on August 1 and 14, 2008, September 22, 2008 and October 13, 2008 (a/k/a the dates of the purported fraudulent transfers), the Trustee's motion must be denied."  That is not correct.  The standard of proof for a fraudulent transfer cause of action is the preponderance of the evidence.[21]  The court

---

[17] Fed. R. Civ. P. 56(c)(1)(A)
[18] 5 Alan N. Resnick and Henry J. Sommer, COLLIER ON BANKRUPTCY § 548.05(3)(A) (16th ed.)
[19] Renovitch v. Kaufman, 905 F.2d 1040, 1044 (7th Cir. 1990)
[20] Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991)
[21] Dobin v. Hill, 342 B.R. 183, 197 (Bankr. D.N.J. 2006) (appropriate standard for a § 548 action is preponderance of the evidence)

6

finds that the Trustee has satisfied his burden of establishing that the Debtor was insolvent on the date of the transfers or that the debtor was not able to meet current obligations. Therefore, the court finds that the Trustee has established the third element.

The final element the Trustee must establish under § 548(a)(1)(B) is that the Debtor "received less than a reasonably equivalent value in exchange for such transfer." The phrase "reasonably equivalent value" is not defined in the Bankruptcy Code and courts have struggled to come up with a workable definition that covers the wide variety of transactions that a debtor might enter into pre-petition. Particularly troubling are transactions such as the EFS transaction in which the court is asked to assess the value of a potential future profit.

The Third Circuit has held that the reasonably equivalent value analysis involves two separate and distinct inquiries: 1) determine whether the debtor received any value at all; and 2) determine if the value of what was received was roughly equal to what the debtor gave up.[22] For the first inquiry, courts should focus on whether at the time of the transfer it was "legitimate and reasonable" to anticipate value flowing to the debtor as a result of the transfer.[23] For the second inquiry, courts may apply a broader totality of the circumstances approach.

So the court turns to the first inquiry: did Designline receive **any** value from the EFS transaction. The obvious answer is "no"; but the Third Circuit has found that even money spent on a losing investment can confer reasonably equivalent value for purposes of § 548.[24] In such situations, the failed investment "would suffice to confer 'value' so long as the expectation was 'legitimate and reasonable.'"[25]

---

[22] Mellon Bank, N.A. v. The Official Committee of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139, 149 (3d Cir. 1996)
[23] Id.(quoting In re Freuhauf Trailer Corp., 444 F.3d 203 (3d Cir. 2006))
[24] R.M.L., 92 F.3d 139 (3d Cir. 1996)
[25] R.M.L. at 152 (quoting Metro Communications at 647)

7

The Trustee argues that he satisfies his burden on this element because the "Debtor was neither the intended beneficiary of the EFS License *nor* the recipient of the opportunities that would have resulted from the use of the EFS License."[26]  In other words, the Trustee's position is that there was no direct or indirect benefit flowing to the Debtor.

The Defendants appear to be confused as to whether they are making a direct or indirect benefit argument.  For example, Mr. Sarangoulis certifies that "Longview and Designline determined that a joint effort to purchase certain technology would benefit both companies and they pursued a license for patented construction technology owed by John Hildreth."[27]  He further certifies that "[u]pon determining that the parties, including Designline, could make substantial profit due to the ability that the technology could provide each company in construction opportunities, Longview and Designline negotiated Designline's buy-in price."[28] Those statements would suggest that the Defendants are arguing that the Debtor was the direct beneficiary of the transfers because it was the party to the negotiations (as opposed to Mr. Slabon negotiating on his own behalf) and Designline was the party "buying into" the transaction.  But other evidence - including Mr. Sarangoulis's own certification - suggests that the Debtor was, at most, intended to be an indirect beneficiary of the transfers.  For example, Mr. Sarangoulis attempts to downplay the significance of forming holding companies to own the EFS license "in the face of the parties' clear intentions and expectations that Designline was one of the identified end users of the EFS Technology."  That statement suggests that the only opportunity the Debtor would have to profit would be through the additional business that Mr. Sarangoulis and Mr. Slabon envisioned would be generated by the use of the EFS technology.  Ultimately, the Defendants's confusion over whether the Debtor would benefit directly or indirectly is not

---

[26] Trustee brief at 9
[27] Sarangoulis cert. at para. 5
[28] Sarangoulis cert. at para. 10

8

determinative of this motion. The determinative issue is whether it was "legitimate and reasonable" to anticipate value – direct or indirect - flowing to the Debtor as a result of the transfers. For that determination, the court will look at each of the five transfers individually.

The court first turns to the Debtor's initial transfer of $375,000 that occurred on June 12, 2008. The parties do not dispute that in May 2008, Mr. Sarangoulis delivered a blank check in the amount of $300,000 to Mr. Hildreth. Mr. Sarangoulis vaguely explains the reason for this payment as: "for purposes of commencing a relationship with EFS in the form of due diligence."[29] As that vague explanation demonstrates, the court and the Trustee are forced to glean the specifics of the EFS transaction from indirect evidence because the parties never finalized an agreement. The lack of formal agreement is highly relevant to this analysis because it means that the Debtor was under no contractual obligation to make any of these payments to the Defendants.[30]

Yet, without the benefit of a formal agreement – including an escrow agreement – Mr. Sarangoulis paid a large sum of money for what appears to be the mere possibility of obtaining an agreement to license the EFS technology. Mr. Sarangoulis certifies that days after he paid Mr. Hildreth $300,000 "Designline provided its share of the initial contribution, $375,000"[31] Once again, Mr. Sarangoulis appears to be confused about the nature of this transaction. Designline's payment of $375,000 was not for a "share" in the $300,000 initial investment; that was Designline making Mr. Sarangoulis whole by repaying him in full for his initial investment, and then paying him a $75,000 premium on top of that. Despite Mr. Sarangoulis' unsupported assertions that he lost money in the EFS transaction, his own certification establishes that within

---

[29] Defendants' Response to Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment at para. 10
[30] The Defendants have not attempted to establish the existence of an oral contract.
[31] Sarangoulis cert. at para. 13

9

days of paying Mr. Hildreth the $300,000, he was reimbursed by the Debtor and made a significant profit. Despite Mr. Sarngoulis' quixotic vision of this transaction,[32] the reality is after the Debtor paid him $375,000, Mr. Sarangoulis no longer bore any risk whatsoever with regard to whether the EFS transaction would materialize; he had only upside potential.[33] All the risk of the EFS transaction not being consummated was borne by Designline and its creditors.

As Mr. Sarangoulis explains the transaction, the parties agreed that Designline would make an initial investment of $375,000, and then pay additional money when the negotiations with Mr. Hildreth progressed.[34] Ultimately, the negotiations with Mr. Hildreth did not progress, but the court's task is to view the transaction as it appeared at the time. Even so, at the time Mr. Slabon wrote a check for $375,000 from the Debtor's account to GMI First, it was merely based on Mr. Sarangoulis's word that there was a deal. The Trustee has established that there was no written agreement between Mr. Sarangoulis and Mr. Hildreth about the EFS technology, there was no escrow agreement regarding the $300,000 (that was now the Debtor's to lose), and there was no agreement between Mr. Slabon and Mr. Sargangoulis. It is conceivable that a handshake transaction such as that was "legitimate and reasonable"; however, the Trustee has also presented evidence that if the EFS transaction actually materialized, the license to use the technology would not be held by the Debtor. Mr. Sarangoulis acknowledges that he and Mr. Slabon intended to create one or more holding companies to hold the license.[35] Based on those unrefuted facts, the court finds that the Trustee has met his burden of showing that the potential of **any** value flowing to the Debtor was not "legitimate and reasonable."

---

[32] "Hildreth's unscrupulous business practices did not tarnish the value of the investment, the viability of the technology and the potential for tremendous return for using the technology still exists today." Sarangoulis cert at para. 44

[33] Not only was Mr. Sarangoulis made more than whole, the parties apparently contemplated his receiving 49% of the holding company that would receive the EFS license.

[34] Sarangoulis cert at para 14

[35] Sarangoulis cert at para. 28

On a motion for summary judgment, after the movant shows there is no genuine issue for trial, the non-moving party then bears the burden of identifying evidence that creates a genuine dispute regarding a material fact.  The Defendants have submitted a certification that states that there was real value for the Debtor in the EFS transaction because Designline "would obtain the exclusive license for construction utilizing the technology in New Jersey."  It is a close call whether that suffices to meet the Defendants's burden.  It is a close call because the Defendants admit that the license would go to a holding company,[36] and there is no documentary evidence that the Debtor would have any ownership interest in the holding company.  Second, Mr. Sarangoulis's certification is silent about how much Designline would have to pay the holding company, Designline Construction DG, LLC, in licensing fees.  That silence is deafening.   It is highly improbable that the parties were intending to allow the Debtor to use the EFS technology without paying a licensing fee to the holding company.

But the court must view all the facts in the light most favorable to the nonmoving party.[37]  The Third Circuit has stated that whenever there is even the "slightest doubt regarding the facts of a case, summary judgment should not be granted."[38]  Based on the stringent standards for summary judgment, the court must find that there is a genuine factual dispute regarding whether at the time of the Debtor's initial investment in June 2008, it was legitimate to anticipate the Debtor profiting.

The standards for summary judgment and at trial are different.  Given the undocumented nature of this transaction, at trial the Defendants are likely to find it difficult to refute the Trustee's establishment that any potential benefit flowing to the Debtor was too attenuated to meet the "legitimate and reasonable" standard.    If the Defendants can establish that there was

---

[36] Slabon Tr. 98:10 – 100:4
[37] Tran v. Metropolitan Life Ins. Co., 408 F.3d 130, 135 (3d Cir. 2005)
[38] Tomalewski v. State Farm Life Ins, Co., 494 F.2d 882, 884 (3d Cir. 1984)

some value for the Debtor, then they will still have to establish that it was the reasonable equivalent of the $375,000 initial investment.

Rather than deny summary judgment based on Mr. Sarangoulis's certification, the Trustee urges the court to apply the sham affidavit doctrine and disregard the certification. That doctrine provides that a party may not create a material factual dispute to defeat summary judgment by filing an affidavit disputing his own prior sworn testimony without plausible explanation for the disparity.[39] The Trustee contends that he has done that because at his deposition when asked if the Debtor was involved in the EFS transaction he responded "Dave was with me" and "I would say Dave is his company".[40]

This is a doctrine that should be applied sparingly. The Third Circuit has stated that " it is clear that merely because there is a discrepancy between deposition testimony and the deponent's later affidavit a district court is not required in all cases to disregard the affidavit."[41] The portion of the Sarangoulis deposition transcript that the Trustee points to as creating a sham could just as easily be interpreted as demonstrating that Mr. Sarangoulis has a reckless disregard for the corporate form. While the failure to recognize the distinction between corporate and individual action may prove his undoing in this case, it is not a justification to apply the sham affidavit doctrine.

Next, the court turns to the transfer in the amount of $40,000, which occurred on August 1, 2008. There was a significant change of circumstances between the first and second transfers. In the intervening time, Mr. Sarangoulis and Mr. Slabon discovered that Mr. Hildreth had not put the initial investment of $300,000 in escrow and had "disappeared with the investment

---

[39] *citing*, Baer v. Chase, 392 F.3d 609 (3d Cir. 2004)
[40] Sarangoulis Tr. 59:21 – 60:16
[41] *Id.* at 624; *see also*, Choudhry v. Jenkins, 559 F.2d 1085, 1090 (7th Cir.1977) (summary judgment was improper even though party's testimony was "not a paradigm of cogency or persuasiveness," inasmuch it was not a "transparent sham").

12

monies."[42] On July 18, 2008, Messrs. Sarangoulis and Slabon each filed a police report claiming that Mr. Hildreth had "stolen" the $300,000.[43] That realization significantly changed the calculus of whether it was "legitimate and reasonable" for Mr. Slabon to continue to believe that it was likely that an agreement with Mr. Hildreth would come to fruition.[44] While Messrs. Sarangoulis and Slabon continued to try to salvage their investment after that, their unfounded belief that a man who had abscond with their $300,000 would be a trustworthy business partner strains credulity. At the very least, a sensible business person would have withheld making any further investment beyond the $375,000 until there was some confirmable evidence that they would be able to acquire the license to the EFS technology. The record is devoid of any evidence that such assurance was forthcoming. Yet, despite having no contractual obligation to do so, and with no apparent pressure from EFS to make a further payment, Mr. Slabon decided that the Debtor should write another check to Mr. Sarangoulis for the investment in the EFS technology.

In undertaking the reasonably equivalent analysis, the court must bear in mind that the purpose of § 548 is "estate preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors."[45] The Third Circuit has recognized that creditors deserve protection from the actions of an "irresponsible debtor".[46] After Mr. Hildreth absconded with the $300,000, it is impossible for the court to conclude that it was "legitimate and reasonable" to anticipate that the Debtor would benefit from further

---

[42] Defendants' brief in opposition at 1
[43] Ex. E to the Orr cert.
[44] There was also an e-mail from Blumer to Moore on July 17, 2008, that indicates the deal was dead.
[45] Mellon Bank, N.A. v. Metro Communications, Inc. (In re Metro Communications, Inc.), 945 F.2d 635 (3d Cir. 1991)
[46] R.M.L., 92 F.3d at 152

investment in this chimeral transaction.  As a result, the court finds that the Debtor did not receive any value for the transfer of the $40,000 on August 1, 2008.

The irresponsibility of continuing to throw money at a highly improbable investment increased with each day that Mr. Hidreth refused to account for their $300,000, or enter into an agreement to license the EFS technology.  Despite that, the money continued to flow.  The Debtor paid Mr. Sarangoulis $46,000 on August 14, 2008; $25,000 on September 22, 2008, which was 10 days before Mr. Sarangoulis and Mr. Slabon filed their lawsuit against EFS in the District Court; and  $85,000 on October 13, 2008, which was **after** the lawsuit was filed.  Once again it must be emphasized that the Debtor had no contractual obligation to make any of these payments.  Based on these uncontested facts,  the court can easily make the express determination required under R.M.L. that the debtor did not receive any value at all for the four transfers that occurred after Mr. Hildreth stole the $300,000, because the expectation of value was not "legitimate and reasonable."  Therefore, the court finds that the Trustee has established his burden as to the fourth element under 548(a)(1)(B).

As a result of that finding, it is not strictly necessary for the court to go on to determine if the value of what was received was roughly equal to what the debtor gave up,[47] but the court will address it as an alternative basis for finding that summary judgment is appropriate for the final four transfers.  Under the second phase of the reasonably equivalent value analysis, courts apply a totality of the circumstances approach to determine if the value was roughly equal.  That approach allows the court to consider whether the agreement between Mr. Slabon and Mr. Sarangoulis made good business sense.  In other words, even if the EFS technology were the equivalent of turning straw into gold (as Mr. Sarangoulis would have the court believe), the terms of the deal still might not have conferred sufficient value on Designline.  The payoff still

---

[47] R.M.L., 92 F.3d at 149

might not be the "reasonable equivalent of what the debtor gave up". What the Debtor gave up here was a total of $571,000 for, at best, a one half interest in a company that might obtain a license for the EFS technology. As stated in Metro Communications, "[t]he touchstone is whether the transaction conferred **realizable** commercial value on the debtor ....".[48] The more remote the possibility of closing the EFS deal became, the less the transfers can be seen as imparting realizable commercial value on the Debtor. Mr. Sarangoulis wants to focus on the wonders of the EFS technology – but if Rumpelstiltskin runs away, then it is immaterial that he knows how to spin straw into gold. And after Mr. Hildreth ran way with the initial investment money, the Debtor still transferred a total of $196,000 to Mr. Sarangoulis.

The filing of the lawsuit against Mr. Hildreth is evidence that even Mr. Sarangoulis and Mr. Slabon were seeing the handwriting on the wall and suspecting that perhaps this transaction would not be the goldmine they anticipated. Typically, suing a potential business partner does not facilitate closing the deal. Yet, days before the lawsuit the Debtor transferred $25,000, and after the lawsuit transferred another $85,000.

The totality of the circumstances approach also permits the court to consider whether this was an arm's length transaction. The court finds that based on the admitted close personal relationship between Mr. Sarangoulis and Mr. Slabon that this was not an arms' length transaction. There is no way to reconcile Mr. Slabon's actions in continuing to pay Mr. Sarangoulis after July 2008 with an arm's length transaction. Or put another way, a reasonable businessperson would not see "realizable commercial value" in the EFS transaction after July 2008.

While the Defendants' attempt to create the impression that the deal was still alive after the police reports and lawsuit, there is no documentary evidence to support that assertion. To be

---

[48] Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635 (3d Cir. 1991)

15

a material dispute that would prevent summary judgment, a fact must have the potential to alter the outcome of the case.[49] No reasonable trier of fact could conclude that after July 2008 that there was a legitimate possibility that the EFS transaction would happen. Even if there had been a chance of the deal consummating after July 2008, a reasonable businessman would have held off making any further investment without additional assurances from Mr. Hildreth. Mr. Slabon did not seek any assurances before transferring another $196,000 of the Debtor's money. Section 548 is designed to protect creditors from irresponsible debtors.[50] Mr. Slabon demonstrably acted irresponsibly with the Debtor's money after July 2008. So even if the court had found that the Debtor received some value from the last four transfers, it still could not find that the value was reasonably equivalent to what the Debtor gave up.

Therefore, the court will grant summary judgment as to the last four transfers, and deny it as to the first transfer.

**Actual fraudulent transfer [11 U.S.C. § 548(a)(1)(A)]**

In Count Two, the Trustee seeks to establish actual fraud. The Code provides that the trustee may avoid a transfer made "with actual intent to hinder, delay, or defraud" creditors. As is typically the case, the Trustee does not rely on direct evidence of fraudulent intent, instead asks the court to infer that intent from various "badges of fraud".[51] In particular, the Trustee points to the debtor's concealment of the transfers; that the debtor was threatened with a lawsuit; lack of reasonably equivalent value; and insolvency. Given that this is a motion for summary judgment and the court must view the facts in the light most favorable to the non-moving party, the court cannot enter judgment on this count.

---

[49] Kaucher v. County of Bucks, 455 F.3d 418 (3d Cir. 2006)
[50] R.M.L., 92 F.3d at 152
[51] Gilchinsky v. Nat'l Westminster Bank, 159 N.J. 463 (1999)

The Trustee claims that the transfers were hidden because the Debtor's books reflected the transfers as being made from the Debtor to EFS, but in reality the payments went to either Mr. Sarangoulis or his company, GMI First. While there may be a factual dispute about how the payments were characterized, that is not the same as the transfers being hidden. Therefore, this badge of fraud has not been established.

Next, the Trustee points to the fact that the Debtor had a personal injury lawsuit pending at the time of the transfers. The Trustee also points to the 90 liens relating to work in progress at the time the petition was filed. The Defendants respond that the lawsuit would have been covered by insurance so it was no threat to the Debtor's financial survival and that the construction liens were just an ordinary part of the business. Again, because the court must view the facts in the light most favorable to the non-moving party the court finds that is a credible explanation.

Lack of reasonably equivalent value and insolvency have already been addressed in the opinion, but the court finds that these badges standing alone are not enough to support a finding that the Defendants harbored an actual intent to defraud creditors through the transfers.

**Conclusion**

The court is granting partial summary judgment on Count One and denying summary judgment on Count Two. On Count One, summary judgment in favor of the Trustee is entered

as to the 4 transfers totaling $196,000 made between August 2008 and October 2008.   The

Trustee should submit a form of order in accordance with this opinion.


                                                            */s/ Kathryn C. Ferguson*
                                                            KATHRYN C. FERGUSON
                                                            US Bankruptcy Judge

Dated:  October 12, 2012